UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division



VICKI A. LINDSEY,

                 Plaintiff

        v.

EDWIN JEWETT, Clerk
400 North Ninth Street
John Marshall Courts Building
Richmond, VA 23219,

        AND

CECELIA HARGROVE, Chief Deputy Clerk
400 North Ninth Street
John Marshall Courts Building
Richmond, VA 23219,

        AND

DONNA LYTHGOE, Supervisor
400 North Ninth Street
John Marshall Courts Building
Richmond, VA 23219,

        AND

DENISE HARRIS, Deputy Clerk
400 North Ninth Street
John Marshall Courts Building
Richmond, VA 23219,

        AND

SANDRA CERUTI, Circuit Court Judges Office
400 North Ninth Street
John Marshall Courts Building
Richmond, VA 23219

               Defendants

Civil Case No.  **3:19-cv-00634-JAG**

**JURY TRIAL DEMANDED**

1

## COMPLAINT

COMES NOW Plaintiff, Vicki A. Lindsey, *pro se*, and moves this Court for judgment against the Defendants, and in support of her Complaint, states as follows:

### I. INTRODUCTION

1.      Between April, 2017 and November 2018, all of the above named defendants, employees of the Commonwealth of Virginia-run Richmond Circuit Court, violated the Plaintiff's civil rights, prior to, during and immediately following a legal malpractice case.

2.      The Order of July 31, 201 started the post-trial clock ticking for any *chances* and any *possible remedies* for the Plaintiff. However, the Plaintiff was not notified of the Order by US Mail or by email. The Plaintiff learned of the Order when she called the Clerk's office on or about August 9, 2017. However, the Plaintiff still was able to file her Notice of Appeal on August 30, 2017.

3.      In spite of the Plaintiff's repeated requests to have access to her records, including a formal Motion filed on August 31, 2017 to preserve the exhibits and records and allow her access to copies or original exhibits, she continued to be denied any access.

4.      The Plaintiff continued to be delayed in knowing which certified transcripts to order as she could not have access to her records. This made preparing for each and every post-trial remedy, including her Statement of Facts - which turned out that she was pointing to evidence that had permanently gone missing - as well as preparing for her Appeal, nearly impossible.

5.      The trial exhibits were admitted on the bench during a 5.5 day trial that stretched past one weekend, ending on May 2, 2017. The exhibits disappeared prior to being scanned or loaded to the record, preventing the Plaintiff from access. The defense counsel and well as the defendants have key-access to both offices on the third floor, where some of the records were ultimately located

2

many months later, in November 2017.  Other records were "found" inside a courtroom, according to

Sandra Ceruti's email on November 22, 2017 and were being taken down to the clerk's office.  The

more than 20 attached documents from City Hall along with the four large commercial blueprints,

authenticated during the trial by a representative from City Hall, were the documents found

inside a courtroom in November 2017.

6.      The Plaintiff's exhibits had been altered, and some exhibits were missing entirely.

## II.  JURISDICTION

7.      Jurisdiction exists in this Court pursuant to the allegations of violations to the Fourteenth

Amendment to the United States Constitution, the right to due process as well as the promise of

legality and fair procedure.  In cases involving violations of the Constitution or federal law, the

Federal District Court has the right to hear those cases for the first time, often referred to as Original

Jurisdiction.  42 U.S. Code §1985 Conspiracy to Interfere with Civil Rights, 18 U.S. Code §241

Conspiracy Against Rights, 18 U.S. Code §242 Deprivation of Rights Under Color of Law are

included in the Counts, as well as 42 U.S.C. § 1983 Deprivation of rights.

## III.  VENUE

8.      The Federal District Court, Eastern District of Virginia, is the correct Venue, pursuant to

28 U.S.C. § 1391 as the district where a substantial part of the events giving rise to the claim

occurred.

9.      The Richmond Division of the Federal District Court, Eastern District of Virginia, is the

correct venue due to the substantial part of the actions giving rise to the Plaintiff's claims took place

in this division.

## IV.  PARTIES

10.     VICKI A. LINDSEY, hereafter referenced as the Plaintiff, is a United States Citizen,

3

residing within the Commonwealth of Virginia for more than 20 years, living in the Richmond

region during all times of the alleged events giving rise to this complaint.·

11.     EDWIN JEWETT, Clerk, is an employee of the Commonwealth of Virginia working for

the Richmond Circuit Court.

12.     CECELIA HARGROVE, Chief Deputy Clerk, is an employee of the Commonwealth of

Virginia working for the Richmond Circuit Court.

13.     DONNA LYTHGOE, Supervisor in the Clerk's office, is an employee of the

Commonwealth of Virginia working for the Richmond Circuit Court.

14.     DENISE HARRIS, Deputy Clerk, is an employee of the Commonwealth of Virginia

working for the Richmond Circuit Court.

15.     SANDRA CERUTI, Circuit Court Judges Office, is an employee of the Commonwealth

of Virginia working for the Richmond Circuit Court.

## COUNT 1

### 42 U.S. Code §1985 Conspiracy to Interfere with Civil Rights

16.     During the same time, in August 2017, while trying to have access to her records, the

Plaintiff was notified by the defense counsel's court reporting firm that she could not order any

further transcripts (she only had the rough-drafts) until she paid her prior counsel's invoice from

January 2017 and March 2017. This court reporting firm had already charged the Plaintiff $2200.00

in May, which she promptly pre-paid as she has always done when ordering transcripts. The court

reporting firm had never mentioned anything about any invoice that had been unpaid by the law firm

in Charlottesville, nor did this court reporting firm know that her prior attorney had directly caused a

$3500.00 unnecessary expense on the Plaintiff, and had previously agreed to pay for the last two

transcripts.  Additionally, the court reporting firm now wanted to charge the Plaintiff $5.50 *per page* for unedited transcripts, evidenced by the email dated August 23, 2017 at 4:23pm.

17.     The Plaintiff made a number of formal requests to Sandra Ceruti, first by phone and then by email to Ceruti and all defense counsel, requesting the possible hearing dates for the Statement of Facts hearing, so the Plaintiff could comply with the Supreme Court of Virginia rules, which require a hearing to commence within 15 days of the submission of the Statement of Facts.  Due to the schedule of the trial judge, knowing available dates and planning ahead is prudent.

18.     On or about August 30, 2017, the Plaintiff met with Edwin Jewett (impromptu, as he happened to be in the clerk's office) and requested that he look over her case and the irregularities taking place, such as no access to records, non-responsiveness from Sandra Ceruti during critical and time-sensitive communications, as well as the fact that the jury was notified on the first day of trial that the Plaintiff was *pro se*, although her attorney had noticed his appearance 17 months *prior* to the trial, and other irregularities involving the jury pool and seating of the jury.   Mr. Jewett informed the Plaintiff that he can't control what takes place on the third floor.

19.     On August 30, 2017, at 6:22pm, the Plaintiff emailed the Notice of Appeal (already US mailed to defense counsel) to the defense, and Sandra Ceruti, and requested that a hearing be scheduled for the filing of the Statement of Facts, as the rules require the hearing to commence within 15 days of filing the Statement of Facts.  There was no response.

20.     As the post-trial clock was ticking, the Plaintiff continued requesting access to her trial exhibits to assist in preparation of her Statement of Facts, necessary for the hearing.  The above named defendants denied the Plaintiff any access to any of her trial exhibits, with Harris telling her that they were not on the record, Lythgoe advising the Plaintiff that she would need a court order to

5

see them, and another unknown clerk (over the phone) telling the Plaintiff that they must be with the Judge in her case as the exhibits were not on the court's system. The judge in her case was appointed, therefore, he was not at the court and had no chambers at the court. Ceruti would not return the Plaintiff's call.

21.    On August 31, 2017, the Plaintiff filed a motion to Preserve the Exhibits and requested access to either copies, or the original documents. Without seeing the exhibits, the Plaintiff was unsure which transcripts she would need to order.

22.    On August 31, 2017 at 5:52pm, the Plaintiff, after US mailing the documents to the Defendants, emailed Sandra Ceruti as well as the defense counsel a copy of the motion, and requested that Ceruti make sure that the Judge receives both the Notice of Appeal as well as the preservation motion so he could see that the Plaintiff was being barred access to her records. In this email, the Plaintiff states, "Thanks, and I will wait to hear from you on a hearing date. I need to file the pre-hearing statement of facts, and then the hearing is supposed to take place within 15 days of that filing, so it is important that I know that hearing date so I can plan accordingly." There was no response. At this point, the clerk's office, the third floor judges offices, the defendants and their counsel, who are all officers of the court, were notified in writing that the records were being withheld from the Plaintiff. Any one person who received notice that the Plaintiff was being barred from her records could have, and likely did, log onto the computer and see that the thousands of pages of exhibits were missing. Yet everyone involved said nothing and did nothing.

23.    In a later email, the Plaintiff requested the date and time that Ceruti notified the trial judge that the Plaintiff had been barred from access to the records. That email went unanswered.

24.    On September 8, 2017, the Plaintiff filed the proposed Statement of Facts with the court,

US mailed them to the defense, then emailed the defense counsel and Sandra Ceruti a copy.  In that email, the Plaintiff wrote, "I am again asking that a hearing be scheduled, as per required by the rules of the Supreme Court of Virginia.  I understand those rules to require a hearing be scheduled to commence within 15 days of filing this document."  In the email, the Plaintiff writes, "Mr Harman and Ms Palmer, Please feel free to contact me with any proposed changes.  I never heard from anyone after filing the Notice of Appeal, nor did I ever received any acknowledgement of my email or US mailed documents to your office.  I am available should you need to discuss."

25.     During this time, defense counsel began picking at words and phrases of the Plaintiff's Statement of Facts, so the Plaintiff filed an Amended Statement of Facts just days after the original Statement of Facts, showing the changes in the sections the defense requested.  As a result of the defense counsel quoting from the rough-draft transcripts, the Plaintiff also relied on the rough-drafts, although the rules allowed her to choose between the Statement of Facts _or_ the transcripts, and the Plaintiff did not know which pages to order without access to the exhibits.

26.     On September 15, 2017 at 4:11pm, Ceruti emailed the Plaintiff and the defense counsel with available dates of October 13, 2017 or October 16, 2017.  The defense selected October 16, 2017.  The Plaintiff responded on September 15, 2017 at 4:14pm that she was available on both dates, and again raised the issue of complying with the 15 day rule, which these dates did not.  The hearing was scheduled for _after_ the deadline to submit transcripts to the record.

27.     During the hearing, it appeared that the trial judge was learning about the records being missing from the clerk's office for the first time, as he started to ask the Plaintiff is she had been trying to get to her records, then cut the Plaintiff off from answering.  This was following Palmer's request to limit the hearing only to the Statement of Facts, and the court complied.  During the

7

hearing, the court states *several times* that he hopes the Plaintiff pursues this case, and later admitted that he did recall the main issue of her appeal regarding changing the Order during the trial regarding the chemical mixture being a fact and not an opinion. The court also agreed that the Plaintiff, per the rules, has a choice in bringing the transcripts *or* the Statement of Facts, but stated that too much time had passed that the court felt that the transcripts would be best. Prior to leaving the bench, the court ordered defense counsel Palmer to lead the Plaintiff to the trial exhibits. Palmer did not provide the Plaintiff with those exhibits, and instead, Palmer directed the Plaintiff to the clerk's office, where the transcripts were still missing.

28.     The Plaintiff was able to get a third party to pay the Charlottesville bill, and later reimbursed the person who covered the two invoices.

29.     The Plaintiff ordered as many transcripts as she could that would support her Statement of Facts, *still with no access to any exhibit records*. Paying and expedite fee, the transcripts were placed upon the record on or about October 23, 2017. There were a number of errors on the transcripts, as well as a witness index with nearly all of the witnesses removed from that index that were harmful to the defense, and helpful to the Plaintiff. Approximately 6 or 7 witness names were simply removed, and additional sections were missing from the certified transcripts.

30.     On October 26, 2017, the Plaintiff was forced to use her only Motion for Extension to the Supreme Court of Virginia due to all trial records being unavailable to her. This information was also filed at the Richmond Circuit Court. The Supreme Court of Virginia granted the extension on October 30, 2017. Patricia Harrington had emailed the Plaintiff on the previous Friday advising her that the Order was being granted.

31.     On October 31, 2017, Edwin Jewett, Donna Lythgoe and Denise Harris certified, then

and sent over the case records to the Supreme Court of Virginia, with all trial exhibits missing from the record. For a variety of reasons, these records were rejected by the Supreme Court of Virginia.

32.     On November 3, 2017, many of the trial records were "located" in two different areas and different floors of the John Marshall Building. They were loaded to the court's system on or about November 6, 2017. A deputy clerk informed the Plaintiff that the blueprints were still missing. These commercial blueprints and the more than 30 8.5 x 11 pages of City Hall documents that joined the blueprints show that Hank Robertson, Highwoods' Director of Operations, ordered the removal of contaminated carpet from the subject building months after the Plaintiff's lab test found the deadly chemicals, and then Robertson himself ordered a rebuttal lab test on the newly installed material, and long after several agencies with the Commonwealth of Virginia had knowledge of the lab report, or received the lab report via email from the Plaintiff, yet failed to vacate the buildings and conduct their own testing. causing a full disruption in the Plaintiff's entire underlying toxic tort case. These documents were of great import, fully authenticated at trial.

33.     On November 8, 2017 and November 9, 2017, the Plaintiff attempted to review the "found" exhibits for the very first time. The entire exhibit list, with thousands of pages of documents and records, had been scrambled and scattered like a deck of cards, making the review nearly impossible. The Plaintiff questioned Donna Lythgoe and Denise Harris about the records being scrambled. Lythgoe and Harris were both at their desks and both within a few feet from the public computer inside the clerk's office. Harris would not make eye contact with the Plaintiff, and just kept her head down and shrugged her shoulders in an "I have no idea" fashion. Lythgoe informed the Plaintiff that they were all loaded in a haphazard way and not in any order, informing the Plaintiff that the Supreme Court of Virginia comes in at night and puts all the records in order.

9

There was no certified table of contents behind the single page of certificate showing the transfer of records to the Supreme Court of Virginia. The Plaintiff later called the clerks office and legally recorded the call with Lythgoe, as evidence of these statements. Because the found exhibits had been backdated by more than 6 months, there was nothing on the record proving that the exhibits were ever missing. However, in another legally recorded call with Liz S, a deputy clerk, Liz informed the Plaintiff that she had personally loaded much of the records, and they were brought down from the third floor (Ceruti's office) and were *in numeric order*.

34. During this attempt at review, Lythgoe would not allow the Plaintiff to make a copy of the "docket report" showing the scrambling of records, nor would Lythgoe allow any downloading of any digital records. The Plaintiff was made to pay .50 per page of anything she copied, as long as it was not the docket report.

35. As a result of the discovery of a number of missing records, and the discovery of a number of altered records, the Plaintiff filed with the Supreme Court of Virginia, a Motion for Certiorari to Expand and Correct the Record, and a Motion to stay the briefing schedule until a full and copious review could take place, while awaiting for the remaining missing records to be found.

36. On November 15, 2017, at 0700.27 hours (7am) the date-stamped records were placed upon the Supreme Court of Virginia's record, only the Plaintiff did not yet know this fact.

37. On November 15, 2017, after 12:00 noon, the Plaintiff received an email from SCOVA Clerk Patricia Harrington, advising her of the Order denying the stay of the briefing schedule as well as the motion to expand the record. The Order was issued by Harrington on November 15, 2017, and the Order that was emailed to the Plaintiff stated that *AFTER* the records were received from the Richmond Circuit Court, the Appellant could resume with motions to correct the record. Of course,

five hours prior to that email, the record sent on November 14, 2017 had *already been placed* on the SCOVA record at 7am on November 15, 2017, a full 5 hours prior to the Order being emailed by Harrington to the Plaintiff.

38.     The most important Plaintiff's science exhibit (Plaintiff's exhibit 15, the raw data) had been stripped of the back 6 pages, and in place of those pages were the redacted pages of the *Defendants' exhibit*. The trial transcripts show that defense counsel Palmer lost her argument to make the Plaintiff redact those back six pages, but the court allowed Palmer to redact *her* own copy of the raw data exhibit when it was *her* turn to put her evidence on the record. The trial transcripts show that only Plaintiff's exhibit 16 had one single line redacted, and Plaintiff's exhibit 15 was not to be redacted, per the court's ruling during the trial. Without any break in time, the moment the court ruled on this issue, Dr. Smythe was called to the stand and Plaintiff's exhibit 15 was admitted to the record and to the bench.

39.     Plaintiff's Exhibit 87A, the main subject of the Plaintiff's appeal, had been fully removed from the exhibit list. Instead, two duplicate copies of Plaintiff's Exhibit 87 were loaded to the record. The missing Exhibit 87A was the most critical document for post trial review of the trial judge, and was the most critical document for Appellate review. The transcripts reveal the trial judge admitting *both* 87 and 87A for Appellate review purpose. By 87A being missing, the trial judge, along with the Supreme Court of Virginia, was prevented from seeing the person's name and signature who authored the documents, which was William J. Dinkin.

40.     By making Plaintiff's Exhibit 87A vanish, the trial judge, as well as the Supreme Court of Virginia, were also be deprived of seeing on the now missing pages, that NO SETTLEMENT DISCUSSIONS HAD TAKEN PLACE. Dinkin had typed that, and the redacted Exhibit 87 even

11

had *that part removed*, along with the name and signature of the author.  No court anywhere would ever allow the use of any document were the author's information was removed.

41.     Simply put, the Plaintiff's Exhibit 87A did not come *from* any settlement conference, rather, they were documents that were prepared for a possible settlement discussion, which never took place because the attorneys for Western and Highwoods (the underlying toxic tort case) were too busy laughing at Dinkin (openly laughing and mocking him and the Plaintiff in the hall) after telling him that TestAmerica had a little surprise for him.  Because Dinkin had never contacted TestAmerica, even nearly three years after the finding of the deadly chemical, Dinkin was unable to cause any settlement discussion to materialize.  The Plaintiff was not allowed to attend the actual meeting, and was told to sit in an empty conference room as she might not understand all of the "lawyer talk" so the Plaintiff did not learn of the details of that meeting until early 2017.

42.     The amount of alterations to the Plaintiff's Exhibits were astonishing, but the clerk's office had pressed the "alphabetize" button during the Plaintiff's two hour review on November 8, 2017 and November 9, 2017, making the review nearly impossible, causing her to spend countless weeks making a list of what had been changed, then matching those alterations to the transcripts and comparing the documents to the evidence presented, all while typing her Petition for Appeal and responding to motions from the defense counsel to deny the appeal.

43.     The Plaintiff's Petition for Appeal, filed on November 29, 2017 was denied on February 14, 2018, citing the reason for the denial (and the *only reason for the denial*) as being that the Plaintiff was late putting the transcripts on the record.  **SEE ATTACHED EXHIBIT A**, the Petition for Appeal.  On February 14, 2018 the Plaintiff filed a Petition for Rehearing, detailing the missing and altered records, but that Petition was denied on March 23, 2018.

12

44.     The Plaintiff filed a Motion to Re-open the Richmond Circuit Court case due to fraud upon the court on April 29, 2018.

45.     According to Edwin Jewett, and Donna Lythgoe (on a legally recorded line) Cecelia Hargrove, Edwin Jewett and Donna Lythgoe held a private meeting regarding the documents filed with the Plaintiff's Motion to Re-open the case. The Plaintiff discovered on October 1, 2018 that her exhibits in that particular filing had been altered, and one item, a first generation copy, was *altered* to appear as if it was a tenth generation copy. Other documents were changed from their intended position, which caused the exhibits to be in conflict with the Plaintiff's motion.

46.     That Motion to Re-open the closed case was intended by the Plaintiff to be a new and independent filing. The Plaintiff had her $400.00 in case to pay for the new filing, though she should have crossed out the old case number. However, the clerk's office refused to allow her to file it that way, and she ultimately had to come back to the court and insist that they charge her something so she would not lose the ability to be heard. This caused a second meeting with Edwin Jewett.

47.     The case was denied due to it not being an independent filing. However, the Order, dated August 20, 2018, was not scanned at the Richmond Circuit Court until August 26, 2018. Then, it was not loaded to the court's record until September 7, 2018. The Order was then back-dated and moved from the September section of the record to the August section of the record, thereby *backdating this undisclosed Order by three weeks*. The clerk's office has admitted, in front of witnesses who have signed Affidavits, to not emailing or US mailing that Order to the Plaintiff. The Plaintiff did not learn of the Order until October 1, 2018.

48.     On or about October 5, 2018, while the Plaintiff and her witness were exiting the clerk's office, Edwin Jewett and Willaim Dinkin were entering the John Marshall building. Dinkin was

13

dressed in street clothing. Jewett nearly ran into the Plaintiff's witness as he was walking at a fast pace, appearing upset, and entering the clerk's office. This was the same day that the Plaintiff and her witness had observed the actual audit trail on the clerk's computer, showing that the August 20, 2018 undisclosed Order had actually been scanned on August 26, 2018 and then withheld from the court's record until September 7, 2018 at approximately 4:30pm, at the exact moment that the Plaintiff was checking into her hotel in Virginia Beach.

## PROXIMATE CAUSE

48.     The conduct and actions of all defendants named in this case were *__the proximate cause__* of the Plaintiff being denied all civil rights, all Constitutional rights to a fair hearing and a fair trial, which includes all components of a fair trial, including all post-trial rights to a *__chance__* at success and a *__chance__* for any remedy and a *__chance__* to have her appeal heard.

49.     The defendants owed the Plaintiff, at a minimum, the securing and protection of all court records, and this is even detailed in the clerks handbook for the Circuit Courts, namely, § 2.2-3704.A and § 2.2-3704.B covers the right of inspection of those records. That legal duty was breached by the actions of the defendants. The actions of these defendants directly caused proximate-cause injury to the Plaintiff. The plaintiff was greatly damaged by the actions of the defendant.

## STATEMENT OF THE CLAIM AND DAMAGES

50.     The conduct of the defendants in the Richmond Circuit Court is simply shocking, and cost the Plaintiff yet another five years of her life. It was willful and wanton conduct.

51.     Not only has the Plaintiff lost valuable life experience and time while fighting this case, but she has lost tens of thousands of dollars, while the defendants engaged in a prolonged plan to strip the Plaintiff of all of her civil rights. This was done with multiple officers of the court either

14

watching and doing nothing, or fully engaging in the conduct. It would be serendipitous for the exact alterations to the record and the missing documents to completely coincide with the exact exhibits that the defense counsel tried to keep off the record, unsuccessfully, at trial. These acts have caused a full disruption, pain and suffering, and insurmountable grief in all aspects of the Plaintiff's life.

52.     There would be no reason to hide the records from the Plaintiff unless the defendants were well aware that the records had been altered. Likewise, there would be no reason to scramble the records to prevent the Plaintiff from quickly discovering the malfeasance unless the participants were well aware of the fraud upon the court as well as the plaintiff. These acts were done with such malice and intent to disrupt the Plaintiff's civil rights, all with the knowledge that these acts would cause great pain and suffering to the Plaintiff.

53.     The Plaintiff's lost her underlying case due to the same type of fraud. That case was filed for 4 million dollars. The Plaintiff is permanently injured due to the poisoning in that case, and has now suffered immeasurably after the conduct presented in this complaint.

54.     The malpractice case was filed for 4.250 million dollars. The Plaintiff has lost all funds spent in the legal malpractice case. Her Legal Standard of Care expert John C. Lowe reported 49 substantive and proximate errors just in her one toxic tort case. The conduct detailed in this case makes those egregious errors pale by comparison.

55.     The defendants engaged in the prolonged activity detailed in this complaint, and although not all details are included, the conduct is clearly intentional, malicious, willful and a reckless disregard for the rights of the Plaintiff to exercise her *contitutional rights* to a fair hearing and a fair trial, which include *all components of that trial*, including post trial remedies and chances at success and fairness.

15

56.     These actions were conducted with a clear knowledge that this conduct would severely injure the plaintiff emotionally, physically and financially, and for the rest of her life.

57.     This conduct was done with malice and aforethought, knowing the conduct would forever alter the trust that the Plaintiff had with anyone, and any court.  It was also foreseeable that this conduct would alter the emotional well-being and the trust the Plaintiff had in a system that she had spend 20 years strongly supporting, as the Plaintiff is a former Certified Fraud Examiner and had also worked in the private sector, testifying in countless cases on behalf of the state, in another state prior to moving to Virginia, 21 years ago.

58.     The conduct of these defendants rises to a level of not only punitive damages, but treble damages are highly appropriate.  If not this case, what other case could *ever* rise to treble damages?

59.     Plaintiff's damages include all expenses in both the underlying and the legal malpractice case, compensatory damages, pain and suffering for the trauma caused by the conduct described herein, to be determined at trial, and punitive damages *and* treble damages.

60.     This Complaint does not cover all acts by these defendants, but covers enough to show this clear cause of action.

61.     As a direct result of these acts, the Plaintiff has been stripped of her dignity, stripped of all savings and all money, stripped of an additional five years of her life, had her deepest trust violated and has been put through an indescribable trauma that has impacted each and every area of her life, and will be impacted for the rest of her life as a result of this conduct.

62.     It is extremely rare when malfeasance and violations to Federally protected civil rights are actually detected and caught.  This is a case that deserves a clear message being sent.

WHEREFORE, the Plaintiff respectfully requests that the Court enter judgment in favor of the

16

Plaintiff for $4,000,000.00 in compensatory damages, and $350,000.00 in punitive damages, and treble damages in an amount of three times the compensatory damages, and any such other relief as this Court deems appropriate.

## COUNT 2

### 42 U.S.C. § 1983  Deprivation of Civil Rights

63.     The Plaintiff incorporates the foregoing paragraphs of the Complaint as if fully set forth herein.

WHEREFORE, the Plaintiff respectfully requests that the Court enter judgment in favor of the Plaintiff for $4,000,000.00 in compensatory damages, and $350,000.00 in punitive damages, and treble damages in an amount of three times the compensatory damages, and any such other relief as this Court deems appropriate.

## COUNT 3

### 18 U.S. Code §241 Conspiracy Against Rights

64.     The Plaintiff incorporates the foregoing paragraphs of the Complaint as if fully set forth herein.

WHEREFORE, the Plaintiff respectfully requests that the Court enter judgment in favor of the Plaintiff for $4,000,000.00 in compensatory damages, and $350,000.00 in punitive damages, and treble damages in an amount of three times the compensatory damages, and any such other relief as this Court deems appropriate.

## COUNT 4

### 18 U.S. Code §242 Deprivation of Rights Under Color of Law

65.     The Plaintiff incorporates the foregoing paragraphs of the Complaint as if fully set forth

herein.

WHEREFORE, the Plaintiff respectfully requests that the Court enter judgment in favor of the Plaintiff for $4,000,000.00 in compensatory damages, and $350,000.00 in punitive damages, and treble damages in an amount of three times the compensatory damages, and any such other relief as this Court deems appropriate.

Respectfully Submitted,

8/30/2019

Vicki A. Lindsey, *pro se*
7518 Elkhardt Rd
Richmond, Virginia 23225
804-357-3337
Email: homes@vickilindsey.com

18